IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**EXPRESS ENERGY SERVICES OPERATING, L.P.,**

   **Plaintiff,**

 v.

**HALL DRILLING, LLC, et al.,**

   **Defendants.**

Case No. 2:14-cv-204
**JUDGE GREGORY L. FROST**
**Magistrate Judge Norah McCann King**

## OPINION AND ORDER

This matter is before the Court for consideration of Plaintiff's motion for sanctions due to spoliation of evidence (ECF No. 62), Defendants' memorandum in opposition (ECF No. 68), and Plaintiff's reply memorandum (ECF No. 71). For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the motion.

### I. Background

Plaintiff, Express Energy Services Operating, L.P., filed this action against Defendants Hall Drilling, LLC, Hall Drilling, LLC, and Hall & Ross Resources. Plaintiff alleges that Defendants own or operate two oil and gas wells, designated the Hercher South No. 1H Well and the Hercher South No. 2H Well, in Monroe County, Ohio. Beginning in November 2013, Defendants and Plaintiff entered into a contract whereby Plaintiff would furnish labor, materials, machinery, and supplies in connection with the drilling and use of these wells. When a dispute arose regarding the wells, detailed below, Plaintiff filed suit to recover amounts allegedly due under the contract. Plaintiff asserts claims for breach of contract, on account, and *quantum*

1

*meruit*, and originally sought foreclosure of a mechanics' lien on mineral interests and related property interests.  Defendants in turn assert counterclaims for breach of contract, negligence, and fraud in connection with Plaintiff's alleged improper testing of a pipe.  Defendants allege that the services provided by Plaintiff included running well casing at the Hercher South No. 1H Well and performing "Torq-Tek" testing.

Events surrounding this testing serve as the basis for the latest dispute.  On November 9, 2013, Plaintiff torqued together 396 joints of casing at the Hercher South No. 1H Well, while a third party drove the torqued joints down the previously drilled well.  The process involved joining 396 pipes, approximately 40 feet in length, with joints between each pipe.  Plaintiff Torq-Tek tested each joint before the corresponding section of pipe was driven into the well.  When a joint failed the Torq-Tek test, Plaintiff was required to take the joint apart and re-make the joint so that it would pass the test.  Defendants allege that, although joint 216 failed the Torq-Tek test, Plaintiff's employee indicated that the joint had been properly made up and that the casing team should proceed with the next joint.  Plaintiff completed all 396 joints.

On November 10, 2013, Defendants began pumping concrete to seal and hold the well casing in place.  Joint 216 allegedly failed during this process.  Plaintiff and Defendants removed the well casing, one section at a time, until it was determined that joint 216 had separated.  The remainder of the casing—joints one through 215—remained in the ground, with the top of the remaining casing at a depth of approximately 7,500 feet.  After several failed efforts to reattach the joints, Defendants hired a company, Baker Hughes, to use a "harpoon" or "cut and pull spear" to puncture the top section of joint 215 and unscrew it from the pipe joint beneath it.  Baker Hughes was able to remove joint 215 from the well on November 14, 2013.

During the course of discovery in this case, Plaintiff sought production of joint 215, but

2

Defendants have been unable to locate the joint. Defendants believe that, "after removal of Pipe Joint 215 from the well hole, Baker Hughes' employees removed it to their work yard and had to cut it from the harpoon tool with a cutting torch." (ECF 68-1, at Page ID # 482 ¶¶ 8-10.) "Hall Drilling Delaware and Hall & Ross have no knowledge what was done with the pieces of Pipe Joint 215 which were cut-off the harpoon tool by Baker Hughes." (*Id*. at ¶ 10.)

In its motion for sanctions, Plaintiff seeks an adverse inference for the asserted spoliation of joint 215. Plaintiff specifically requests that "the Court order that, due to Hall Drilling's spoliation of Joint 215, Express Energy is entitled to receive an adverse inference instruction that the missing evidence would have supported its claims, and refuted the claims of Hall Drilling, for the purpose of trial and any motion for summary judgment." (ECF No. 62, at Page ID # 418.)

## II. Discussion

### A. Standard Involved

"The term 'spoliation' includes the destruction of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Jones v. Staubli Motor Sports Div. of Staubli Am. Corp.*, No. 2:09-CV-1120, 2012 U.S. Dist. LEXIS 133650, at *18-19 (S.D. Ohio Sept. 19, 2012) (quoting *Owner-Operator Indep. Drivers Ass'n v. Comerica Bank*, 860 F. Supp.2d 519 (S.D. Ohio 2012)). A district court is vested with broad discretion to craft proper sanctions for spoliation. *Adkins v. Wolever*, 554 F.3d 650, 651-52 (6th Cir. 2009). "District courts may 'impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence.' " *Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 513 (6th Cir. 2014) (quoting *Adkins*, 554 F.3d at 652-53). "An

adverse inference instruction 'is appropriate if the Defendants knew the evidence was relevant to some issue at trial and . . . [their culpable] conduct resulted in its loss or destruction.'" *Ross v. Am. Red Cross*, 567 F. App'x 296, 302 (6th Cir. 2014) (quoting *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010)). To justify an adverse inference instruction based on the spoliation of evidence, Plaintiff, as the moving party, must establish

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the [evidence was] destroyed with culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Id*. (quoting *Beaven*, 622 F.3d at 553). This test is conjunctive, so a party seeking an adverse inference must satisfy all three prongs. *Id*.

### B. Analysis

Plaintiff seeks an adverse inference instruction that the missing joint 215 would have supported its claims and refuted Defendants' claims. Under the first prong of the *Beaven* test, the party seeking an adverse inference must show that the opposing party had control over the evidence and that the opposing party had an obligation to preserve the evidence at the time it was destroyed. Both requirements are in dispute here.

"An obligation to preserve may arise when a party should have known that the evidence may be relevant to future litigation . . . ." *Beaven*, 622 F.3d at 553 (internal quotations and citations omitted). *See also John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) ("[I]t is beyond question that a party to civil litigation has a duty to preserve relevant information, . . . when that party has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation." (internal quotations omitted)). Plaintiff argues that Defendants "knew as early as November 12, 2013 that a failure of some nature had occurred

4

at the connection between casing joint #215 and #216." (ECF No. 62, at Page ID # 416.) According to Plaintiff, this "fact should have put Defendants on notice that casing joint #215 would be relevant to any future litigation involving the failure . . . [and] that future litigation involving the failure was reasonably foreseeable." (*Id.*) Future litigation was foreseeable, Plaintiff argues, because the failure "was going to cause at least some loss of production time for Defendants, and the loss of production time in the oil and gas industry can cause a loss of revenue for the well owner." (*Id.*)

Defendants argue that Plaintiff has failed to establish that an obligation to preserve joint 215 arose on November 12, 2013, or even by November 14, 2013, when Baker Hughes speared joint 215 from the well. According to Defendants, they could not have "reasonably anticipated litigation" on November 12, 2013, or even on November 14, 2013, because "the cause of the casing failure was unknown to the Defendants." (ECF No. 68, at Page ID # 472.) Defendants argue that, "[a]t the time Baker Hughes fished the Pipe Joint from the well, no litigation had been contemplated nor were the individuals who were present on-site ones who would make any later determination as to whether or not litigation would occur." (*Id.*) Defendants further argue that they were unaware of Plaintiff's alleged misrepresentation and alteration of business records related to the torqueing of joint 215 until November 18, 2013.

The Court agrees that Defendants should have known that joint 215 may be relevant to future litigation prior to the time joint 215 was destroyed or lost. Defendants' Project Status Report, dated November 12, 2013, indicates that a separation occurred in the pipe casing between joints 215 and 216 at a depth of nearly 7,500 feet. The report details and includes pictures of Defendants' efforts on November 11 and 12, 2013, to reattach and repair the separated casing. Joint 216 was photographed and it was noted that the joint "was missing the

threads as they were worn off as the pipe mushroomed in form." (ECF No. 62-1, at Page ID # 425.) The report also contains "a graph of the pipe that parted" and notes that "[t]he shoulder torque was low (192 ft lbs) but it was accepted." (*Id.* at Page ID # 427.) Defendants' Project Status Report dated November 17, 2013, details Baker Hughes' efforts to spear joint 215 out of the well. (ECF No. 62-1, at Page ID # 435-36.) The report contains pictures of Baker Hughes' harpoon tool, joint 215 coming out of the well, and joint 215 after it had been retrieved from the well. (*Id.*)

> According to Defendants,
>
> [t]he best evidence to demonstrate whether Express Energy did its job correctly would be the fact that (1) Express Energy was hired to insure that the Casing Joints were properly made up; (2) the "Torq-Tek" test results unequivocally demonstrate that the Casing Joint 216 was not properly made up; (3) Express Energy's technician manually overrode a determination by the "Torq-Tek" testing equipment that the Casing Joint was not properly made up; (4) Casing Joint 216 failed which corroborates these results; and (5) of 396 joints tested, Express Energy altered its own data/business records only with respect to Casing Joint 216.

(ECF No. 68, at Page ID # 477-78.) The Project Status Report dated November 12, 2013, demonstrates that Defendants were aware of the first four considerations prior to the time that Baker Hughes speared joint 215 from the well. Defendants have presented evidence that they were not aware until November 18, 2013, that Plaintiff altered its records with respect to the torqueing of joint 216. (ECF No. 68-1, at Page ID # 483 ¶ 14.) This evidence suggests that Defendants could not have reasonably anticipated litigation based on fraud prior to November 18, 2013. However, Defendants' counterclaims for breach of contract and negligence are premised on Plaintiff's alleged improper torqueing of joint 216, not fraud. (ECF No. 13, at Page ID # 209-15.) Defendants allege that joint 216 " 'blew out' and failed, causing a failure of the well casing" because Plaintiff accepted a "low shoulder torque." *(Id.* at Page ID # 211 ¶¶ 13,

15.)  These facts were known to Defendants on November 12, 2013.

Defendants have also presented evidence that "there were no discussions or conversations regarding litigation being contemplated nor were the individuals who were present on-site ones who would make any later determination as to whether or not litigation would occur."  (ECF No. 68-1, at Page ID # 482 ¶ 11.)  Even so, the Court concludes that, under the circumstances of this case, a reasonable person *would* have anticipated litigation by the time Baker Hughes speared joint 215 from the well and *should* have known that joint 215 may be relevant to the litigation.  At that time, Defendants apparently knew that the pipe casing separated and "blew out" at a depth of approximately 7,500 feet (with 9,084 feet of casing remaining in the well below the separation point), that Plaintiff accepted a "low shoulder torque" at the place of separation, and that efforts to reattach the casing had been unsuccessful.

The parties also disagree whether Defendants were in control of joint 215 after the casing separated.  Defendants insist that it was Baker Hughes that had control of joint215 from the time that it was speared from the well until it was cut apart and, apparently, discarded.  Plaintiff counters that Defendants owned joint 215 and that Baker Hughes was Defendants' agent hired to spear the joint from the well.  Plaintiff argues that Defendants "directed, monitored, and photographed" the removal of joint 215 and that Defendants "had both the ability and opportunity to take possession of the joint, or to direct Baker Hughes to take reasonable steps to preserve Joint 215 if Baker Hughes had to leave the site with that joint still attached to the fishing spear."  (ECF No. 71, at Page ID # 586.)

Defendants do not contest that they owned joint 215 or that they hired Baker Hughes to spear joint 215 from the well.  Although Baker Hughes had possession of the joint after it was speared from the well, Defendants were nevertheless able to document and photograph the joint

during and after its removal from the well. Under these circumstances, the Court concludes that Defendants had control of joint 215 such that they could have taken possession of the joint prior to its presumed destruction.

"To warrant a spoliation sanction, the party seeking the sanction must show that the evidence was destroyed with a culpable state of mind." *Adkins v. Wolever*, 692 F.3d 499, 504-05 (6th Cir. 2012). "This factor is satisfied 'by a showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently.' " *Id*. (quoting *Beaven*, 622 F.3d at 554). *See also Stocker v. United States*, 705 F.3d 225, 235 (6th Cir. 2013) ("The requisite 'culpable state of mind' may be established through a 'showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it,' but even negligent conduct may suffice to warrant spoliation sanctions under the appropriate circumstances." (quoting *Beaven*, 622 F.3d at 554)). Because spoliation may fall along a continuum of fault, ranging from innocence to intentionality, the degree of fault found should inform the severity of the sanctions imposed. *Adkins*, 554 F.3d at 652–53.

There is no evidence that Defendants intentionally destroyed or lost joint 215. Defendants hired Baker Hughes to spear joint 215 from the well. After removing joint 215 from the well, it is believed that Baker Hughes' "employees removed [joint 215] to their work yard and had to cut it from the harpoon tool with a cutting torch." (ECF No. 68-1, at Page ID # 482 ¶ 10.) There is no indication that Defendants instructed Baker Hughes to dispose of joint 215, and Defendants "have no knowledge what was done with the pieces of Pipe Joint 215 which were cut-off the harpoon tool by Baker Hughes." (*Id*. at Page ID # 482-83 ¶¶ 11-13.) Nevertheless, Defendants inspected and photographed joint 215 after it had been speared from the well, and they should have known at that time that joint 215 would be relevant to future litigation.

Defendants could have preserved joint 215 after its removal from the well or instructed Baker Hughes to preserve joint 215, but they failed to do so. Although there is no evidence that this failure was intentional, Defendants' default in this regard was at least negligent and resulted in the destruction or loss of joint 215.

Finally, a party seeking an adverse inference instruction based on the destruction of evidence must show "that the destroyed evidence was 'relevant' to the party's claim or defense." *Beaven*, 622 F.3d at 553. In this context, "relevant" means

> something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.

*Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, ___ F.3d ___, No. 14-3002, 2014 WL 7247400, at *3 (6th Cir. Dec. 22, 2014) (alterations in original) (quoting *Automated Solutions Corp.*, 756 F.3d at 514). "To make this showing, the moving party 'may rely on circumstantial evidence to suggest the contents of destroyed evidence.'" *Id*. (quoting *Beaven*, 622 F.3d at 555).

In support of Plaintiff's argument that joint 215 is relevant to its defense, Plaintiff has produced the Affidavit of Dr. Robert S. Carbonara, Ph.D. (ECF 62-3.) Dr. Carbonara, an employee of SEA Ltd., has expertise in "metallurgy, metals analysis, material failure analysis, material compatibility, and corrosion analysis." (*Id*. at Page ID # 448 ¶ 2.) According to Dr. Carbonara, "[c]asing joint connection failures can be caused by a multitude of factors, many of which have nothing to do with the integrity of the casing joint connection itself. Potential causes, among others, include driller error, material failure, and poor well design." (*Id*. at ¶ 8.) Dr. Cabonara avers that the condition of joint 215 "will provide critical insight into the proximate cause of th[e] failure," and that "the inspection and testing of casing joint #215 is

9

essential to the determination of the proximate cause of the failure that is the subject of this case." (*Id*. at ¶¶ 6-7.) Dr. Cabonara further avers that a "determination of whether joint #215 complied with material specifications applicable in the gas and oil industry can only be determined through inspection and metallurgical testing of the joint." (*Id*. at Page ID # 448-49 ¶ 10.)

Defendants argue that Plaintiff has failed to proffer any evidence that joint 215 would have supported Plaintiff's defense of the counterclaims. According to Defendants, an inspection of joint 215 would not refute any of the following facts:

> (1) Express Energy was hired to insure that the Casing Joints were properly made up; (2) the "Torq-Tek" test results unequivocally demonstrate that the Casing Joint 216 was not properly made up; (3) Express Energy's technician manually overrode a determination by the "Torq-Tek" testing equipment that the Casing Joint was not properly made up; (4) Casing Joint 216 failed which corroborates these results; and (5) of 396 joints tested, Express Energy altered its own data/business records only with respect to Casing Joint 216.

(ECF No. 68, at page ID # 477-78.) Defendants' arguments are not well taken.

Defendants' arguments to the contrary notwithstanding, Plaintiff need not refute Defendants' theory of the case to establish that joint 215 is relevant. The parties disagree whether Plaintiff's torqueing of joint 216 was the proximate cause of the separation in the pipe casing. Plaintiff has presented evidence from Dr. Cabonara that a proximate cause determination is dependent on the inspection and testing of joint 215. (ECF No. 62-3, at Page ID # 448-49 ¶¶ 6-10.) Plaintiff has therefore established that joint 215 is relevant to its defense, as "a reasonable trier of fact *could* find" that joint 215 would support Plaintiff's defense. *See Beaven*, 622 F.3d at 553 (emphasis added).

Considering the foregoing, Plaintiff has established that an adverse inference instruction based on the spoliation of evidence is warranted. Plaintiff asks the Court to conclude "that, due

to Hall Drilling's spoliation of Joint 215, Express Energy is entitled to receive an adverse inference instruction that the missing evidence would have supported its claims, and refuted the claims of Hall Drilling, for the purpose of trial and any motion for summary judgment." (ECF No. 62, at Page ID # 418.)

As noted, "failures to produce relevant evidence fall along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality." *Adkins*, 554 F.3d at 652-53 (internal quotations omitted). Thus, "the severity of a sanction may, depending on the circumstances of the case, correspond to the party's fault." *Id*. "'[A] proper spoliation sanction should serve both fairness and punitive functions.'" *Arch Ins. Co. v. Broan-NuTone, LLC*, 509 F. App'x 453, 457 (6th Cir. 2012) (quoting *Adkins*, 554 F.3d at 652.). In this context, "adverse-inference instructions are typically permissive, in that they allow, but do not require, the factfinder to infer a given fact." *Id*. at 459 (citing *Beaven*, 622 F.3d at 555; *Dae Kon Kwon v. Costco Wholesale Corp.*, 469 F. App'x 579, 580 (9th Cir. 2012)). "A permissive instruction is particularly appropriate if the evidence was not intentionally destroyed." *Id*. (citing *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1159 (1st Cir. 1996)).

There is no evidence or even suggestion here that Defendants intentionally destroyed joint 215. Baker Hughes speared joint 215 from the well, and it appears that Baker Hughes cut the joint into pieces with a cutting torch to remove the joint from the harpoon tool. It is also significant that Plaintiff's own employees were also present when Baker Hughes speared joint 215 from the well, but even they failed to request that joint 215 be preserved. Plaintiff torqued the pipe casing together, was aware of the separation in the casing, and participated in the failed efforts to reattach the casing. Like Defendants, Plaintiff was on notice that future litigation was likely, but Plaintiff nevertheless failed to request that the joint be preserved. Moreover, although

11

a jury could conclude, based on Dr. Carbonara's affidavit, that the inspection and testing of joint 215 would support Plaintiff's defense to the counterclaims, Defendants have presented evidence that, if believed, supports that the casing separated at joints 215 and 216 because of Plaintiff's failure to properly torque joint 216.  Under these circumstances, the Court concludes that a permissive, rather than mandatory, adverse inference instruction is warranted.

### III.  Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for sanctions due to spoliation of evidence.  (ECF No. 62.)  Plaintiff is entitled to a permissive adverse inference and corresponding jury instruction related to the spoliation.

**IT IS SO ORDERED.**

    /s/   Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE